[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED JULY 31, 1997
The Bridgeport Roman Catholic Diocesan Corporation, Bishop Walter W. Curtis, Bishop Edward Egan, and Monsignor Andrew T. Cusack move for summary judgment in four cases wherein the plaintiffs[1] seek compensation for injuries allegedly caused by Father Raymond S. Pcolka who, the plaintiffs allege, sexually assaulted them between 1966 and 1982, when the plaintiffs were minors. Father Pcolka is not a participant in these summary judgment proceedings. The Diocese, Bishop Curtis, Bishop Egan, and Monsignor Cusack claim that as a matter of law they cannot be CT Page 3107 found liable under any of the three theories of liability that the plaintiffs have pleaded against the movants. These theories are (1) vicarious liability, (2) negligent supervision, and (3) civil conspiracy. For the reasons stated below, the relief requested by the defendants is granted in part. The motions are granted with respect to the claims based on vicarious liability and civil conspiracy but denied with respect to the claims based on negligent supervision.
A "motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." Wilson v. New Haven, 213 Conn. 277, 279,567 A.2d 829 (1989). The court should grant the motion if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2]
I. Vicarious Liability/Respondent Superior
The first group of motions this court will discuss are those that challenge the plaintiffs' theory that the Diocese is liable to the plaintiffs under the doctrine of vicarious liability. The plaintiffs rely on theories of vicarious liability in three of the four cases that are the subject of this memorandum. "Vicarious liability is based on a relationship under which it has been determined as a matter of public or social policy that one person should be liable for the act of another, irrespective of the participation of the person vicariously liable." LaBontev. Federal Mutual Ins. Co., 159 Conn. 252, 258, 268 A.2d 663
(1970). In the case of Sharon See v. Bridgeport Roman CatholicDiocesan Corp., the two plaintiffs alleged in counts one and three that the Diocese is vicariously liable for the conduct of Father Pcolka. In the case of George Rosado v. Bridgeport RomanCatholic Diocesan Corp., the thirteen plaintiffs allege in the first, third, fifth, seventh, ninth, eleventh, thirteenth, fifteenth, seventeenth, and nineteenth counts that the Diocese and Bishop Curtis are vicariously liable. In the case of RichardRosado v Bridgeport Roman Catholic Diocesan Corp., the one plaintiff alleges in count one that the Diocese and the defendant Bishop"[3] are vicariously liable. In each of these three cases, the four movants have filed motions for summary judgment addressed to the counts in which liability is based on the theory of vicarious liability. All the plaintiffs oppose the motions. They claim that the misconduct of Father Pcolka should be imputed to the Diocese, Bishop Curtis, and Bishop Egan under the doctrine CT Page 3108 of respondeat superior. The plaintiffs also claim that the defendants are liable because Father Pcolka was acting within his apparent authority and because his misconduct was ratified by the movants.
 A.
"Under the doctrine of respondeat superior, `[a] master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business.' Pelletier v. Bilbiles, 154 Conn. 544, 547,227 A.2d 251 (1967)." Glucksman v. Walters, 38 Conn. App. 140,144, 659 A.2d 1217, cert. denied, 235 Conn. 914, 665 A.2d 608
(1995). "It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment. W. Prosser W. Keeton, Torts (5th Ed. 1984) § 70, p. 502." (Internal quotation marks omitted.)Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 505,656 A.2d 1009 (1995). Ordinarily, it is a question of fact for a jury to decide whether an employee is acting within the scope of his employment. Brown v. Housing Authority, 23 Conn. App. 624, 628,583 A.2d 643 (1990), cert. denied, 217 Conn. 808, 858 A.2d 1233
(1991). "In some situations, however, the acts of the servant are so clearly without the scope of his authority that the question is one of law." (Internal quotation marks omitted.) Id.
"A servant acts within the scope of employment while engaged in the service of the master . . . While a servant may be acting within the scope of his employment when his conduct is negligent, disobedient and unfaithful . . . that does not end the inquiry. Rather, the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business . . . Unless [the employee] was actuated at least in part by a purpose to serve a principal, the principal is not liable." (Citations omitted; internal quotation marks omitted.) A-G Foods, Inc. v. PepperidgeFarms, Inc., 216 Conn. 200, 209-10, 579 A.2d 69 (1990).
"The doctrine of respondeat superior . . . is based on public policy considerations that the employer shall be held responsible for the acts of those whom he employs, done in and about his business, even though such acts are directly in conflict with CT Page 3109 orders which he has given him on the subject." (Internal quotation marks omitted.) Belanger v. Village Pub I, Inc.26 Conn. App. 509, 520, 603 A.2d 1173 (1992). "[I]t must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine to apply. (Internal quotation marks omitted.) A-G Foods, Inc. v.Pepperidge Farms, Inc., supra, 216 Conn. 208.
The decisional law in our state indicates that the theory of vicarious liability is inapplicable to the facts of these cases. Our Supreme Court, in reviewing a case brought by a police officer who sought indemnification from a municipality for expenses incurred in defending against criminal charges for sexual assault that were ultimately dismissed, stated that "it is by no means clear . . . that there would be vicarious liability at common law for sexual assault. W. Seavey, Agency (1964) 89(c), pp. 156-58; Restatement (Second), Agency §§ 228, 245 (1958)."Rawling v. New Haven, 206 Conn. 100, 106 n. 3, 537 A.2d 439
(1988). Many trial court judges have held that sexual misconduct by an employee occurs outside the scope of employment. SeeGutierrez v. Thorne, 13 Conn. App. 493, 498-99, 537 A.2d 527
(1988); Nutt v. Norwich Roman Catholic Diocese, 921 F. Sup. 66, 71
(D.Conn. 1995); Doe v. Norwich Roman Catholic DiocesanCorporation, Superior Court, judicial district of Middlesex at Middletown, Docket No. 369529 (June 27, 1996,17 CONN. L. RPTR. 277, Stengel J.); Mullen v. Horton, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 533347 (October 18, 1995, Hennessey, J.) Curry v. Dubish, Superior Court, judicial district of Waterbury, Docket No. 120782 (March 23, 1995 Flynn, J.); Martin v. Plude, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 278393 (March 18, 1994, Maiocco, J.); Maule v. Sullivan, Superior Court, judicial district of Hartford-New Britain, Docket No. 517623,9 CONN. L. RPTR 542 (August 9, 1993, Wagner, J.).
The plaintiffs cite as authority for their position those cases which hold that an employer may be vicariously liable for an assault and battery committed by an employee charged with maintaining order on the employer's premises. See Pelletier v.Bilbiles, 154 Conn. 544, 227 A.2d 257 (1967); Glucksman v.Walters, supra, 38 Conn. App. 140; Wilson v. R.F.K. Corporation,19 Conn. App. 548, 563 A.2d 738 (1989); Reilly v. DiBianco,6 Conn. App. 556, 507 A.2d 106 (1986). The cited cases involve factual scenarios that are distinguishable from the present cases. When an employer charges an employee with the duty to CT Page 3110 maintain order and the employee's assault and battery arises out of this duty, the employer is held vicariously liable because the employee is attempting to further the employer's business and his actions confer a benefit upon the employer. Compare Brown v.Housing Authority, supra, 23 Conn. App. 628 (employee not acting in the scope of employment, and employer not vicariously liable for employee's assault and battery of a third person arising out of a traffic incident occurring while employee was on duty and driving employer's vehicle). The cases of which the plaintiffs rely are inapposite authority since there is no evidence the alleged sexual assaults by Father Pcolka furthered the Diocese's business or accomplished something for the benefit of the Diocese. While an employer may be vicariously liable for the intentional torts committed by a disobedient servant, the employee in such situations must be "engaged in a disobedient or unfaithful conducting of the master's business." (Emphasis added.) A-G Foods, Inc. v. Pepperidge Farms, Inc., supra,216 Conn. 209-10.
The plaintiffs have submitted affidavits from Father Pcolka and other diocesan priests wherein the affiants assert that they were confused as to the Diocese's stance on celibacy. While these affidavits may present a question as to the effectiveness of the Diocese's long-standing policy prohibiting sexual activity by its priests, the affidavits do not raise a question as to whether Father Pcolka's alleged misconduct occurred within the scope of his employment. The affidavits do not show that the actions attributed to Father Pcolka could be part of, or incidental to, a priest's duties as an employee of the Diocese. There is no evidence to demonstrate how sexual abuse, sexual assault, or sexual exploitation benefitted [benefited] the Diocese or furthered the Diocese's business.
Ordinarily, whether an employee acts within the scope of employment is a question of fact to be decided at trial. Nevertheless, some conduct is so clearly outside the scope of employment that there can be no factual question on the point to be decided at trial. After examining the documentary evidence submitted by the parties, this court concludes that there is no evidence in the record to support the plaintiffs' claims that Father Pcolka was acting within the scope of his employment or in furtherance of the affairs of the Diocese when the alleged sexual misconduct occurred. The evidence shows that the Diocese has always prohibited priests from engaging in sexual relations of any kind. All priests are required to take a vow of celibacy. CT Page 3111 Because the alleged misconduct of Father Pcolka was not part of a priest s duties nor customarily within the Diocese's business, the conduct did not occur within the scope of employment or in furtherance of the Diocese's business. Such misconduct involved an abandonment by Father Pcolka of his duties as a priest, and, consequently, an abandonment of the Diocese's business.
 B.
The plaintiffs next argue that a question of fact exists as to whether the Diocese is vicariously liable under the doctrine of apparent authority. "It is a general rule of law that the principal in a principal/agent relationship is only bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal, and within the scope of the agent's employment." (Emphasis added: internal quotation marks omitted.) Newton Associates v. NortheastStructures, Inc., 15 Conn. App. 633, 637-38, 546 A.2d 310 (1988). "An essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." (Emphasis added.) First Charter National Bank v. Ross,29 Conn. App. 667, 673, 657 A.2d 909 (1992). "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal." (Citations omitted: internal quotation marks omitted.) Tomlinson v. Board of Education, 226 Conn. 704,734, 629 A.2d 333 (1993).
The plaintiffs have not proffered any evidence to demonstrate that the Diocese conducted itself in a manner which suggested to the plaintiffs that Father Pcolka was authorized to engage in sexual conduct on behalf of the Diocese. The evidence shows that the Diocese has always taught its members and the general public that priests are prohibited from engaging in sexual activity of any kind. The record contains no evidence that the Diocese ever conveyed a contrary message to the plaintiffs or to the public at large.
In order to establish apparent authority, two criteria must be met. Tomlinson v. Board of Education, supra, 226 Conn. 734. "First, it must appear from the principals conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the CT Page 3112 agent] to act as having such authority . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Citations omitted; internal quotation marks omitted.)Id., 734-35.
The plaintiffs' assertion that Father Pcolka would not have had access to the plaintiffs "but for" his authority as a priest does not demonstrate that the Diocese authorized Father Pcolka to engage in sexual activity on behalf of the Diocese. There is no evidence to suggest that the Church knowingly permitted Father Pcolka to act as if he had such authority. Nor is there evidentiary proof that any of the plaintiffs reasonably believed, under all the circumstances, that Father Pcolka had the necessary authority to bind the Diocese by his actions. The doctrine of apparent authority
 C.
The plaintiffs argue that an issue of fact exists as to whether the Diocese ratified the acts of Father Pcolka. "Ratification means the adoption by a person. as binding upon himself, of an act done in such relations that he may claim itdone for his benefit, although done under such circumstances as would not bind him except for his subsequent assent." [Emphasis added.) Hartford Accident Indemnity Co. v. S. Windsor Bank Trust Co., 171 Conn. 63, 72, 368 A.2d 76 (1976). Because there is no evidence that Father Pcolka's alleged sexual misconduct was undertaken for the benefit of the Diocese's business, the Diocese cannot be vicariously liable under the doctrine of ratification.
For the foregoing reasons, the court grants the defendants' motions for summary judgment directed to the counts that are based on the theory of vicarious liability.
 II.
The court will next discuss those motions that challenge the plaintiffs' theory that the Diocese and Bishop Curtis are liable for negligent supervision of Father Pcolka. In the case of SharonSee v. Bridgeport Roman Catholic Diocesan Corp., the plaintiffs allege in the second and fourth counts that the Diocese is liable to them for having negligently supervised Father Pcolka. In the case of George Rosado v. Bridgeport Roman Catholic DiocesanCT Page 3113Corp., the plaintiffs allege in the second, fourth, sixth, eighth, tenth, twelfth, fourteenth, sixteenth, eighteenth, twentieth, twenty-first, twenty-second and twenty-fourth counts that the Diocese and Bishop Curtis are liable for these having negligently supervised Father Pcolka. In the case of RichardRosado v. Bridgeport Roman Diocesan Corp., the plaintiff Rosado in count two alleges that the Diocese and Bishop Curtis are liable to him for their having negligently supervised Father Pcolka.[4]
The defendants assert several arguments in support of their motion for summary judgment. The defendants first point out that the plaintiffs in the Sharon See and George Rosado cases allege that they were sexually abused, exploited and assaulted by Father Pcolka during the years of 1966 through 1982. The defendants contend that in order to prove any one of the first three specifications of negligence in the Sharon See and George Rosado cases, see footnote 4. the plaintiffs must prove that the Diocese, prior to the end of the 1982 calendar year, had actual or constructive notice of sexual activity or propensity on the part of Father Pcolka. In the Richard Rosado case, the plaintiff Rosado claims that he was sexually abused, exploited and assaulted by Father Pcolka during the 1972 calendar year. The defendants contend that in order to prove any of the first, third, fourth or fifth specifications of negligence, see footnote 4, the plaintiff must prove that the Bishop or Diocese had either actual or constructive notice of sexual activity or propensity on the part of Father Pcolka prior to the end of the 1972 calendar year. The defendants argue that there is no evidence that any of the defendants had constructive or actual notice of Father Pcolka's sexual propensities. The plaintiffs, on the other hand, maintain that a genuine issue of material fact exists as to this issue.
"The existence of a duty of care is an essential element of negligence." Coburn v. Lenox Homes, Inc. 186 Conn. 370, 375,441 A.2d 620 (1982). "Where there is no legal duty, there can be no actionable negligence. "Neal v. Shiels, Inc., 166 Conn. 3, 12,347 A.2d 102 (1974). "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Internal quotation marks omitted.) Zamstein v. Marvasti, 240 Conn. 549, 558 (1997). "Existing Connecticut precedents impose only a limited duty to take action to prevent injury to a third person." Fraser v.CT Page 3114United States, 236 Conn. 625, 632, 674 A.2d 811 (1996).[5]
Under Connecticut law, the defendants did not owe a duty of care to the plaintiffs to protect them from Father Pcolka's actions unless the defendants knew or had reason to know that Father Pcolka had the propensity to engage in sexual misconduct. See also Nutt v. Norwich Roman Catholic Diocese, 921 F. Sup. 66,70-71, 74-76 (D.Conn. 1995); Doe v. British Universities NorthAmerican Club, 788 F. Sup. 1286, 1292 (D.Conn. 1992); Tichenor v.Roman Catholic Church of Archdiocese of New Orleans,32 F.3d 953, 959-60 (5th Cir. 1994); Kennedy v. Roman Catholic Diocese ofBurlington, 921 F. Sup. 231, 234 (D.Vt. 1996). Since the plaintiffs in the Sharon See and George Rosado cases claim they were injured before the end of the year 1982, they must show that the defendants had such notice prior to the end of 1982. The plaintiff Richard Rosado must show that the defendants had such notice prior to 1972. The fact that the Diocese was aware of, or should have been aware of, sexual misconduct by other diocesan priests does not establish that the harm allegedly committed by Father Pcolka was foreseeable to the defendants.[6] What must be shown is that the Diocese had notice of Father Pcolka's propensity to engage in sexual misconduct.
To show the absence of notice, the defendants offer the affidavit of Bishop Curtis who attests that the defendants did not know and never had "any reason to know, to suspect or to believe Father Pcolka to have engaged in any sexual activity of any kind." (Curtis Affidavit, ¶ 9.) The defendants also offer the affidavit of Monsignor Cusack who attests "[that at no time during my tenure as Diocesan Director of the Ministry for Clergy and Religious . . . did I ever receive any complaint relating to any possible sexual misconduct on the part of Father Raymond Pcolka. other than Ms. Landro's June 1983 complaint . . ." (Cusack Affidavit. ¶ 10.)
In response, the plaintiffs offer several documents that they claim raise a genuine issue of material fact as to the Diocese's knowledge of Father Pcolka's sexual propensities. First, the plaintiff's offer two psychiatric reports, issued in 1960 and 1961 while Father Pcolka was enrolled in the seminary, which suggest that Father Pcolka might need additional psychological testing before taking his vows. The plaintiffs maintain that the defendants never required further testing and that if they had, the Diocese might have learned about Father Pcolka's sexual propensities. Next, the plaintiffs offer a letter dated August 29, 1975, from the Holy See granting Father Pcolka dispensation CT Page 3115 from the use of wine during the consecration of the mass. The plaintiffs claim that it can be inferred from the fact a dispensation was granted that Father Pcolka had a problem with alcohol and, therefore, was psychologically unstable. The plaintiffs also offer two letters which were sent to Bishop Curtis during the months of June and August 1976 by parents of a parishioner complaining that Father Pcolka's relationship with their daughter-in-law was interfering with their son's marriage. The parents asserted that Father Pcolka was buying their daughter-in-law gifts, giving her money, and providing her with transportation. They requested that the Bishop investigate the matter. The plaintiffs contend that these letters demonstrate Father Pcolka's instability and argue that, if the Diocese had investigated these complaints, it would have discovered Father Pcolka's propensity for sexual misconduct. While these documents raise an issue of fact as to Father Pcolka's general mental stability, they do not demonstrate a predisposition toward sexual misconduct. The plaintiffs must demonstrate that the defendants had knowledge of a predisposition toward sexual misconduct and not just notice of psychological problems in general. Doe v. British University North American Club, 786 F. Sup. 1286, 1292
(D. Conn. 1992).
The plaintiffs also argue that letters missing from Diocesan records suggest that the defendants knew or should have known about Father Pcolka's sexual proclivities prior to June of 1983, when Monsignor Cusack received Ms. Landro's complaint. The plaintiffs argue that the disappearance of two complaint letters, coupled with Bishop Curtis's admission that he removed certain "antiquated' personnel records, gives rise to an inference that the Diocese destroyed records which would demonstrate the defendants had knowledge of Father Pcolka's sexual misconduct. This offer of proof is too speculative to dispute the defendants' assertion that they had no knowledge of Father Pcolka's sexual misconduct prior to June of 1983.
Much more significant is the plaintiffs' presentation of affidavits from Ronald J. Slossar, Sr.[7] and William Slossar. These affidavits show that there is a genuine dispute as to whether the defendants had notice of Father Pcolka's sexual misconduct prior to June of 1983. Ronald J. Slossar. Sr. attests that "[d]uring approximately 1979 — 1982 I was told by my sons that they were sexually assaulted by Father Pcolka which abuse started when William was fondled by Father Pcolka as he was being robed as an altar boy. At the time my sons revealed this to CT Page 3116 me Father Pcolka [w]as assigned to Holy Name parish in Stratford. I told the pastor . . . [y]ou better watch out for Father Pcolka. this is what he did to my children. He abused them." (Slossar, Sr. Affidavit, ¶ 8.)
The affidavit of William Slossar attests that he was "repeatedly sexually abused by Father Pcolka" from approximately 1971-1973 and that "sometime in the early 1980s" he wrote letters reporting the sexual abuse to:
 (a) Bridgeport Catholic Diocese on Jewett Street in Bridgeport, addressed to either Bishop Curtis or Monsignor Cusack;
 (b) Greater Archbishop Counsel in Washington, D.C.
 (c) Father Tomasko at St. John Nepomucene Church.
While the defendants dispute the dates on which these letters were allegedly sent and the defendants' receipt of the letters, the affidavits of Ronald J. Slossar, Sr. and William Slossar nevertheless raise a genuine issue of material fact as to whether the defendants knew or should have known of Father Pcolka's sexual proclivities prior to the end of 1982. Therefore, the court cannot find as a matter of law that the defendants did not owe a duty of care to the plaintiffs in the Sharon See and George Rosado cases. Whether the defendants owed a duty of care to the plaintiffs in the Sharon See and George Rosado cases must be decided in the factual context of a full trial. The motions for summary judgment on the claims relating to negligent supervision in the Sharon See and George Rosado cases must be denied.
The fourth and fifth specifications of negligence in the Sharon See case and the second, sixth, and seventh specifications of negligence in the Richard Rosado case, see footnote 4, are essentially based on claims the Diocese and Bishop Curtis owed a duty to the plaintiffs to establish, maintain and enforce policies for reporting, investigating, and dealing with priests accused of sexual misconduct and that the defendants owed the plaintiffs a duty to promulgate and enforce rules proscribing priests from bringing children to private rooms. The defendants contend that, like the other claims of negligence, the plaintiffs must first prove the defendants had knowledge of sexual CT Page 3117 misconduct by priests that would put the defendants on notice that a more effective system for dealing with such problems was needed. The defendants further argue that they had appropriate policies and that the policies were followed.
To show that there were instances of sexual abuse of children that would serve as adequate notice, the plaintiffs offer evidence of the following incidents. Around January 1, 1966, the parents of Mark Frechette complained to the Diocese that Father Lawrence Brett verbally made a sexual solicitation in January 1964 to their son, who was fifteen years old at the time. In 1965, Father Brett sexually assaulted a nineteen year old male student at Sacred Heart University. Sometime between 1966 and October of 1978, Father Martin J. Federici was twice accused of sexually abusing youths. The parties dispute the year the first accusation was made. In 1978 or 1979, Father Joseph P. Moore was accused of sexually assaulting two youths. The defendants emphasize the unique factual circumstances surrounding these incidents and argue that their limited prior knowledge of these incidents was insufficient to give rise to any duty on the part of the Diocese, prior to the end of 1982 in the Sharon See and George Rosado cases and 1972 in the Richard Rosado case, to have maintained a more effective system for dealing with incidents of alleged priest sexual misconduct either in general or with particular reference to Father Pcolka. Arguably, fair and reasonable persons could reach different conclusions on this issue. Resolving this issue by way of summary judgment is not appropriate.
The defendants further argue that, assuming the Diocese was required to promulgate and enforce policies. it had adequate policies that were followed. The evidence shows that the Diocese did have policies for dealing with problem priests. Whether these policies were adequate is again a question on which fair and reasonable persons could reach different conclusions.
For the foregoing reasons, the court concludes that the issues in the Sharon See, George Rosado and Richard Rosado cases that arise out of claims of negligent supervision on the part of the Diocese and Bishop Curtis are not appropriate issues to be resolved by way of summary judgment.[8] Accordingly, these particular motions for summary judgment are denied.
III. CT Page 3118
Finally, the court will discuss the motions for summary judgment that challenge the plaintiffs' allegations of a civil conspiracy. The plaintiffs seek compensation from the Diocese, Bishop Curtis. Bishop Egan, and Monsignor Cusack on the theory that a conspiracy between these defendants led to the plaintiffs suffering harm as a result of sexual misconduct committed by Father Pcolka. The plaintiffs rely on this theory of liability in two of the four cases that are the subject of this memorandum. In the case of Richard Rosado v. Bridgeport Roman Catholic DioceseConn., the plaintiffs civil conspiracy claim is set forth in the third count of the complaint. In the case of Brian Freibott v.Bridgeport Roman Catholic Diocese Corp., the thirteen plaintiffs allege only one claim, which is civil conspiracy. The defendants move for summary judgment on these claims on two alternate grounds: (1) the conspiracy claim is barred: by the intracorporate conspiracy doctrine and (2) a conspiracy did not exist or cause the plaintiffs' injuries. This court rules in favor of the defendants on the first ground and, because the ruling is dispositive of the motions, does not rule on the second ground.
In both cases, the plaintiffs allege the following: Father Pcolka sexually abused, exploited and assaulted the plaintiffs from 1966 through 1982. As a result, the plaintiffs suffered harm. Bishop Curtis, Bishop Egan, and Monsignor Cusack combined and conspired to create an environment or atmosphere which allowed Father Pcolka to sexually abuse, exploit and assault the plaintiffs. In furtherance of this combination and conspiracy, the defendants (1) agreed not to advise the public of Raymond Pcolka's actions; (2) agreed not to remove Raymond Pcolka from positions which allowed him access to children; (3) agreed to reassign Raymond Pcolka to various parishes without warning parishioners of those parishes; (4) agreed not to require Raymond Pcolka to undergo medical treatment and attention; (5) agreed not to suspend Raymond Pcolka for his actions; (6) agreed to keep information about Raymond Pcolka's behavior from the public; and (7) failed to report Raymond Pcolka to the proper law enforcement authorities. The combination and conspiracy led to the damages suffered by the plaintiffs. The purpose of the conspiracy was to prevent the public from knowing about the sexual abuse, exploitation and assault of children by Raymond Pcolka and various other members of the clergy.
"The concept of civil conspiracy is . . . used to extend liability in tort . . . beyond the active wrongdoer to those who CT Page 3119 have merely planned, assisted, or encouraged his acts." Speiser, Krause, and Gans, The American Law of Torts, § 3.4, p. 387 (1983). A civil action for conspiracy is an action for damages caused by acts committed pursuant to an agreement. Cole v.Associated Construction Co., 141 Conn. 49, 54, 103 A.2d 529
(1954). To establish the liability of a party, it is necessary to prove that the party was actuated by the same wrongful intent and had substantially the same knowledge of the wrongful means and purposes as the other participants in the conspiracy. Williams v.Maislen, 116 Conn. 433, 438, 165 A. 455 (1933). The elements of a civil action for conspiracy are: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which results in damage to the plaintiff." (Internal quotation marks omitted.) Marshak v.Marshak, 226 Conn. 652, 665, 628 A.2d 964 (1993).
The defendants first contend that liability under a conspiracy doctrine is precluded by the intracorporate conspiracy doctrine. This doctrine relates to the first element of a civil conspiracy, i.e. a combination between two or more persons. InDay v. General Electric Credit Corp., 15 Conn. App. 677, 684,546 A.2d 315, cert. denied, 209 Conn. 819, 551 A.2d 755 (1988), the Appellate Court explained this doctrine as follows: "Employees of a corporation acting in the scope of their employment cannot conspire with one another or with the corporation that employs them: each acts for the corporation and the corporation cannot conspire with itself." Fletcher's Treatise on Corporations defines the doctrine as follows: "A corporation cannot conspire with itself anymore than an individual can, and hence it appears to be the general rule that a corporation cannot conspire with its officers, agents or employees when they are acting solely for the corporation. The corporation may be held liable for conspiracy, however, (1) where its officers, agents or employees were acting for personal reasons, (2) or where they have an independent personal stake in achieving the object of the conspiracy, (3) or where an independent third party conspired with the corporation." W.M. Fletcher, 10 Fletcher Cyc. Corp. § 4884 (1983).
There is no dispute as to Bishop Curtis, Bishop Egan and Monsignor Cusack being employees of the corporate defendant. The defendants contend that their conduct was within the scope of their employment and that the intracorporate conspiracy doctrine CT Page 3120 therefore applies. The plaintiffs, on the other hand, contend that the individual defendants were not acting within the scope of their employment. The plaintiffs further argue that the individual defendants had a personal stake in achieving the object of the conspiracy.[9]
The defendants have submitted affidavits and documents to demonstrate that the alleged activities giving rise to the plaintiffs' claim for civil conspiracy concern the conduct of officers and employees acting on behalf of the corporate defendant. The documents and affidavits show that the Diocese was incorporated as the Bridgeport Roman Catholic Diocesan Corporation in August of 1953. The corporation by-laws provide that the Bishop is always the president of the corporation. Bishop Curtis was the president of the Diocesan Corporation from 1962 until the fall of 1988, when Bishop Egan succeeded him.
Between September 11, 1972, and September 25, 1987, Monsignor Cusack was employed by the Diocese in the position of Director of Ministry for Clergy and Religious, a position which later became known as the Office of the Episcopal Vicar for Clergy and Religious. This position is responsible for formulating and administering the personnel policies and practices relating to clergy in the diocese. (Cusack Affidavit, ¶ 4.) Monsignor Cusack had a major role in the formulation and administration of the Diocese's personnel policies and practices relating to its clergy between September 11, 1972, and September 25, 1987, but had no involvement in the formulation or administration of those policies and practices subsequent to September 1987. During June of 1983, he received a complaint from Ms. Jamiejo Landro of New Britain that Father Pcolka had sexually abused her as a child many years previously. Monsignor Cusack confronted Father Pcolka with the complaint and received a complete denial from him. Monsignor Cusack states that at no time prior to his receiving Ms. Landro's complaint in June of 1983 had he ever received any complaint or information relating to sexual misconduct by Father Pcolka. Monsignor Cusack states that at no time prior to June of 1983 did he have reason to suspect or to believe there to be any sexual misconduct by Father Pcolka. Monsignor Cusack further states that during his tenure as Diocesan Director of the Ministry for Clergy and Religious and as Diocesan Episcopal Vicar for Clergy and Religious he never received any complaint relating to sexual misconduct on the part of Father Pcolka other than the complaint from Ms. Landro in June of 1983. Monsignor Cusack concludes his affidavit by stating that he never agreed or CT Page 3121 conspired with anyone to conceal or otherwise permit sexual misconduct on the part of Father Pcolka.
Bishop Edward M. Egan states in his affidavit that prior to his becoming Bishop of the Diocese of Bridgeport in the fall of 1988 he had no affiliation with the Diocese nor did he have any involvement in the operation of the Diocese. Prior to December 14, 1988, he did not have any specific knowledge or awareness of Father Pcolka or of the personnel policies or practices of the Diocese. Bishop Egan further states that at no time prior to August 1989, when the Diocese received a complaint from James Krug's mother about James Krug and his sister having been sexually abused by Father Pcolka more than ten years previously, had he ever had any reason to suspect or to believe that Father Pcolka had engaged in any sexual misconduct. Bishop Egan states that the Diocese, in response to Mrs. Krug's complaint in August 1989, confronted Father Pcolka with the allegations of the complaint and received from him a complete denial. The Diocese also obtained a psychiatric examination and evaluation of Father Pcolka from the Institute of Living in Hartford which, in August 1989, reported no basis for challenging Father Pcolka's denial. Bishop Egan further states that at no time subsequent to August 1989 did he have further reason to suspect Father Pcolka of sexual misconduct until December 1992, when James Krug made a complaint to the Diocese.
The plaintiffs cite to pages of a transcript of Bishop Curtis' deposition to support their contentions that Bishop Curtis did not have a policy to prevent children from being sexually abused, that the Diocese had a lax policy for dealing with complaints of sexual abuse of children, that there was no screening policy for priest applicants of the Diocese, that the Diocese would do everything possible to avoid complaints from being made public, that Bishop Curtis would not reprimand priests for violating their vows of celibacy, that the Diocese would not follow up on the supervision of priests, and that the Diocese would keep secret or destroy the records of sexual abuse. The plaintiffs also claim that Bishop Egan and Monsignor Cusack violated General Statutes § 17a-101 by not reporting complaints of sexual abuse to law enforcement authorities. The defendants claim these statements of the plaintiffs are groundless misrepresentations and distortions.
The plaintiffs claim that the defendants' conduct was wrongful and therefore not within their scope of employment. "The CT Page 3122 test is not the wrongful nature of the conspirators' action but whether the wrongful conduct was performed within the scope of the conspirators' official duties." Doe v. Board of Education ofHononegah Community High School District #207, 833 F. Sup. 1366
(N.D.Ill. 1993). Each of the acts that the plaintiffs claim was conspiratorial conduct on the part of the three individual defendants was within the scope of their respective employment as Diocesan officials. Moreover, the documentary evidence submitted in connection with the motions for summary judgment clearly shows that the complaints to the defendants about Father Pcolka's having committed sexual misconduct were made at a time when the alleged victims had already reached their eighteenth birthdays. Because the victims were eighteen or over at the time of the complaints, the reporting requirements of General Statutes §17a-101 did not apply. Therefore, the individual defendants did not have a personal stake in a conspiracy.
Based on the foregoing, this court concludes that the intracorporate conspiracy doctrine applies. Because this doctrine applies, the defendants have demonstrated that, as a matter of law, there was not an combination by two or more persons, which is the first essential element of a civil conspiracy. Accordingly, these motions for summary judgment are granted.
 IV.
To summarize, the court rule is on the motions for summary judgment as follows:
Vicarious liability: In the case of Sharon See v. BridgeportRoman Catholic Diocesan Corp., the motion directed to the first and third counts is granted. In the case of George Rosado v.Bridgeport Roman Catholic Diocesan Corp., the motion directed to the first, third, fifth, seventh, ninth, eleventh, thirteenth, fifteenth, seventeenth, and nineteenth counts is granted. In the case of Richard Rosado v. Bridgeport Roman Catholic DiocesanCorp., the motion directed to the first count is granted.
Negligent supervision: In the Sharon See case, the motion addressed to the second and fourth counts is denied. In the George Rosado case, the motion directed to second, fourth, sixth, eight, tenth, twelfth, fourteenth, sixteenth, eighteenth, twentieth, twenty-first, twenty-second and twenty-fourth counts is denied. In the Richard Rosado case, the motion directed to the second count is denied.[10]
CT Page 3123
Civil conspiracy: In the Richard Rosado case, the motion directed to the third count is granted. In the Brian Freibott case, the motion directed to the one-count complaint is granted.
THIM, J.