[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] AMENDED MEMORANDUM OF DECISION RE: RENEWED MOTION FOR SUMMARY JUDGMENT OF NOVEMBER 6, 1997
 FACTS
The present motion before the court is the defendant Bridgeport Roman Catholic Corp. 's Renewed Motion for Summary Judgment.[1] The multiple plaintiffs' complaints allege that Father Raymond Pcolka, a Roman Catholic priest serving in the Bridgeport Roman Catholic Diocese, sexually abused, sexually assaulted sexually exploited the plaintiffs while they were minors. The alleged misconduct occurred on various dates between 1966 and 1982. Sexual abuse of minors is now the subject of a reporting requirement pursuant to General Statutes § 17a-101.[2]
The complaints in these actions seek damages against the Bridgeport Roman Catholic Diocesan Corporation, Bishop Walter W. Curtis,[3] Bishop Edward M. Egan, and Monsignor Andrew T. Cusack (the defendants). The plaintiffs had claimed liability of the defendants under the following theories: (1) vicarious liability, (2) negligence, and (3) civil conspiracy.[4]
The defendants filed a renewed motion for summary judgment with respect to the negligence claims on November 6, 1997, arguing that the first amendment to the United States constitution prohibits the court from adjudicating the adequacy of defendants' internal administrative and disciplinary policies. CT Page 6955 The plaintiffs have filed an objection, arguing that thefirst amendment does not bar the remaining negligence claims. The matter was heard by the court on May 4, 1998.
 DISCUSSION
"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) Maffucci v. RoyalPark Limited Partnership, 243 Conn. 552, 554, ___ A.2d ___ (1998).
 A. Law
"The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment . . . provides that `Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .'" (Emphasis omitted.) Church of Lukumi Babalu Aye,Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S.Ct. 2217,124 L.Ed.2d 472 (1993). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Id., 532.
"The principle that government, in pursuit of legitimate interests, cannot in a [selective manner impose burdens only on conduct motivated by religious belief] is essential to the protection of the rights guaranteed by the Free exercise Clause." Id., 508 U.S. 543. However, several courts have determined that a claim of institutional negligence does not require any inquiry into religious doctrine or practice. "Instead, review only requires the court to determine if the Church Defendants knew of [the minister's] inappropriate conduct, yet failed to protect third parties from him. The court is simply applying secular standards to secular conduct which is permissible underFirst Amendment standards. . . ." Konkle v. Henson, 672 N.E.2d 450, 456
CT Page 6956 (Ind.App. 1996). "The common law doctrine of negligence does not intrude upon the free exercise of religion, as it does not discriminate against [a] religious belief or regulate or prohibit conduct because it is undertaken for religious reasons.'. . . The court's determination of an action against the defendants based upon their alleged negligent supervision of [Pcolka] would not prejudice or impose upon any of the religious tenets or practices of Catholicism. Rather, such a determination would involve an examination of the defendants' possible role in allowing one of its employees to engage in conduct which they, as employers, as well as society in general expressly prohibit." (Citation omitted.) Nutt v. Norwich Roman Catholic Diocese, 921 F. Sup. 66,74 (D.Conn. 1995). "Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution."Moses v. Diocese of Colorado, 863 P.2d 310, 320 (Colo. 1993), cert. denied, 511 U.S. 1137, 114 S. Ct 2153, 128 L.Ed.2d 880
(1994).[5] See also Smith v. Privette, 495 S.E.2d 395, 398
(N.C.App. 1998) (claims against church are not precluded byfirst amendment where issue is whether church know or has reason to know of an employee's propensity to engage in sexual misconduct, conduct that the church does not claim is part of its tenants or practices).
It is apparent to the court, that in determining whether the defendants were negligent in the supervision of Pcolka, it would be able to apply neutral principles of tort law to determine whether the defendants failed to act when they knew or should have known of Pcolka's engaging in the alleged tortious conduct. "[T]here is no indication that, by taking the kind of preventative action required by tort law, the [institutional] defendants would have violated any `doctrine practice or law' of the Roman Catholic Church. In the absence of such a conflict, subjecting the [institutional] defendants to potential tort liability does not violate their right to free exercise of their religion." Smith v. O'Connell, 986 F. Sup. 73, 79 (D.R.I. 1997). Further, the court is confident that this would not prejudice or impose upon the religious beliefs or practices of the Catholic faith.
In addition, the court will be able to apply neutral principles of tort law to conduct that is expressly prohibited by the laws of this state. "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Employment Division, Dept. of Human Resources ofCT Page 6957Oregon v. Smith, 494 U.S. 872, 878-79, 110 S.Ct. 1595,108 L.Ed.2d 876, reh. denied, 496 U.S. 913, 110 S.Ct. 2605,110 L.Ed.2d 285 (1990). "The First Amendment does not provide an absolute freedom to act with regard to religious beliefs. . . . Instead, that freedom can be regulated for the protection of society. . . . The protection of society requires that religious organizations be held accountable for injuries they cause to third persons." Konkle v. Henson, supra, 672 N.E.2d 456. "To hold otherwise would impermissibly place a religious leader in a preferred position in our society." Sanders v. Casa View BaptistChurch, 134 F.3d 331, 336 (5th Cir. 1998). See also Kenneth R. v.Roman Catholic Diocese, 654 N.Y.S.2d 791, 796 (N.Y.App.Div. 1997) (religious entities have some duty to prevent injuries caused by persons in their employ whom they have reason to believe will engage in injurious conduct); Jones By Jones v. Trane,591 N.Y.S.2d 927, 931 (N.Y Sup. Ct. 1992) (court would not dismiss negligence claims where the misconduct charged is sexual abuse of an infant). In dicta, a Florida appellate court stated that "the Academy of Florida Trial Lawyers makes a convincing case that theFirst Amendment does not protect the church when the acts of the clergy involve children and are criminal in nature. . . . [J]ust as the State may prevent a church from offering human sacrifices, it may protect its children against injuries caused by pedophiles by authorizing civil damages against a church that knowingly (including should know) creates a situation in which such injuries are likely to occur." Doe v. Dorsey, 683 So.2d 614, 617
(Fla.Dist.Ct. 1996). "Since the Supreme Court has consistently failed to allow the Free Exercise Clause to relieve [an] individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs, the defendants [cannot] appropriately implicate the First Amendment as a defense to their alleged negligent conduct." (Internal quotation marks omitted.) Nutt v. Norwich Roman Catholic Diocese, supra,921 F. Sup. 74. "The Free Exercise Clause might well prohibit this court from interfering in the manner in which the Diocese supervised a priest's performance of Mass, or confession, but it certainly cannot prohibit this court from determining whether the Diocese should be liable for negligently allowing its employees to engage in criminal conduct." Reed v. Zizka, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 555221 (March 5, 1998, Aurigemma, J.). See also Reynolds v. Zizka,
Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 555222 (March 5, 1998, Aurigemma, J.) (motion to strike on First Amendment grounds denied, relying on Nutt). CT Page 6958
 B. Questions of Fact
At oral argument, both parties placed their reliance on the depositions of Bishop Curtis and Monsignor Cusack. A review of those depositions reveals that there are disputed issues of material fact concerning whether and/or when the individual defendants knew or should have known about Pcolka's alleged conduct.
Bishop Curtis was Bishop of the Bridgeport Diocese from 1961 until 1988. (Deposition, Bishop Walter Curtis, August 8, 1996, p. 105). While he was bishop, Bishop Curtis had a policy concerning accusations made against priests, by which he would refer any complaints to the director of personnel, Monsignor Cusack, who would then handle the complaint. (Curtis Deposition, July 31, 1995, p. 9). Monsignor Cusack would then verbally report his findings to Bishop Curtis. (Curtis Deposition, July 31, 1995, p. 23). Through the years Bishop Curtis was Bishop of the Bridgeport Diocese, there was never an occasion when he issued a reprimand or admonishment to a priest in the diocese, as this function was performed by Monsignor Cusack, whom the priests knew represented Bishop Curtis on these matters. (Curtis Deposition, July 31, 1995, p. 24). When asked whether anyone had come to complain to him about priests in the diocese sexually abusing children, Bishop Curtis responded that he could not answer. (Curtis Deposition, July 31, 1995, pp. 27-28; August 8, 1996 pp. 118, 133). Bishop Curtis specifically could not recall any complaints made to the diocese concerning sexual abuse allegations against Pcolka. (Curtis Deposition, October 30, 1996, p. 175). Bishop Curtis also did not remember whether he took any action concerning a letter sent to the diocese dated June 30, 1983 regarding a complaint concerning Pcolka, or whether a complaint had been made. (Curtis Deposition, July 31, 1995, pp. 35-38). Bishop Curtis also testified that it was possible that he may never have seen the June 30, 1983 letter, and that he would only have seen such a letter if it was brought to his attention by Monsignor Cusack. (Curtis Deposition, July 31, 1995, pp. 44-45). When asked how many claims of sexual abuse the diocese had settled while he was Bishop of the Bridgeport Diocese, Bishop Curtis could not recall any. (Curtis Deposition, July 31, 1995, p. 72). Bishop Curtis also testified that it was Monsignor Cusack who met with families of alleged victims when complaints of improper conduct were made. (Curtis Deposition, July 31, 1995, pp. 80-81). Bishop Curtis did not remember discussing with CT Page 6959 Monsignor Cusack a meeting the Monsignor had with the victim who mailed the 1983 letter. (Curtis Deposition, October 30, 1996, p. 189).
Monsignor Cusack testified that in 1972 he was appointed director of the ministry for clergy, which included acting as director of vocations, director of continuing education and director of personnel and Vicar of Religious by Bishop Curtis. (Deposition, Monsignor Andrew T. Cusack, November 11, 1995, pp. 23-25). Monsignor Cusack recalled a complaint filed against Pcolka in 1983, which Monsignor Cusack recalled as being the first complaint filed against Pcolka. (Cusack Deposition, November 11, 1995, p. 156). The complaint stemmed from an incident which occurred approximately ten years earlier. (Cusack Deposition, November 11, 1995, p. 179). Monsignor Cusack met with the alleged victim, who claimed to have been fondled by Pcolka as a young woman, and her counselor. (Cusack Deposition, November 11, 1995, pp. 159-61). The affidavit of Martin Starr, who purports to have been the victim's counselor in 1983, has also been submitted. (Affidavit of Martin Starr, February 8, 1993). The victim's accusations were denied by Pcolka. (Cusack Deposition, November 11, 1995, pp. 168-69). After Pcolka was examined at a retreat house, a meeting was held between Bishop Curtis, Monsignor Cusack and the person who examined Pcolka, during which the examiner stated his opinion that there was every reason to believe Pcolka's denial. (Cusack Deposition, November 11, 1995, pp. 170-71). Pcolka was allowed to continue in the ministry, as it was decided there was no validity to the 1983 allegation. (Cusack Deposition, November 11, 1995, p. 188). Monsignor Cusack was unaware that there were other alleged incidents, which plaintiffs' counsel characterized as being over nineteen in number, of improper conduct before and since the alleged incident in 1983. (Cusack Deposition, November 11, 1995, p. 186-87). He testified that the 1983 complaint was the one and only complaint he dealt with concerning Pcolka. (Cusack Deposition, November 11, 1995, p. 193; November 18, 1996, p. 454). Monsignor Cusack also testified that a copy of the June 30, 1983 letter was sent on to Bishop Curtis. (Cusack Deposition, November 18, 1996, p. 395). Monsignor Cusack consulted with Bishop Curtis on all matters, even rumors, concerning improper behavior, and when a situation of misconduct arose, Bishop Curtis' separate files would be checked to determine what subsequent steps to take in investigating the allegations. (Cusack Deposition, November 18, 1996, p. 453).[6]
CT Page 6960
 Knowledge and Notice are Factual Issues
What the defendants knew or should have known and when they knew or should have known it are material facts which cannot be resolved on the present renewed motion for summary judgment. "A `material' fact has been defined adequately and simply as a fact which will make a difference in the result of the case. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; internal quotation marks omitted.) Hammer v. Lumberman's Mutual Casualty Co.,214 Conn. 573, 578, 573 A.2d 699 (1990). "The issue of notice or knowledge . . . is a question of fact and therefore properly within the province of the trier." (Internal quotation marks omitted.) Halloway v. Nejan, Superior Court, judicial district of Danbury at Danbury, Docket No. 307893 (September 6, 1995, Stodolink, J.). "A party's actual knowledge is a question of fact for the trier. . . . Likewise, what [the defendants] had reasonable cause to believe or should have known presents a factual question best left to the ultimate trier. Knowledge, like intent, most often must be inferred from the surrounding circumstances. The deposition testimony and other evidence provided in support and opposition to the motion for summary judgment suggests to the court the possibility that contrary inferences may be drawn by the fact finders concerning the surrounding circumstances and what [the defendants] knew or should have known in this case about [Pcolka]. The court should not and will not draw these inferences upon a motion for summary judgment." (Citation omitted.) Kalina v. K-Mart Corp., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 269920 (August 5, 1993, Lager, J.).
 The Issue of the Defendants' Knowledge or Notice is Law of the Case
As previously found by the court, (Thim, J.) reasonable minds could differ concerning when the diocese knew or should have known that Pcolka was allegedly engaging in improper behavior with minor parishioners. "Whereas a decision of one trial judge that is res judicata is binding on the second judge who confronts it, a decision of one trial judge that declares the law of the case is not a limitation on the power of the second judge in the case to decide otherwise, under appropriate circumstances. . . . The dividing line is not . . . whether the two decisions are made in the same or different actions; the dividing line is in the CT Page 6961 nature of the first decision. If the first decision was final, in the res judicata sense, it cannot be disregarded under the doctrine of the law of the case. If, however, the first decision was not final, but was merely interlocutory, it falls within the doctrine of the law of the case." CFM of Connecticut, Inc. v.Chowdhury, 239 Conn. 375, 403, 685 A.2d 1108 (1996).
In See v. Bridgeport Roman Catholic Diocese Corp., supra,20 Conn. L. Rptr. 275, the court, Thim, J., when examining the validity of the negligence claims on the previous motion for summary judgment, held that the plaintiffs in the See and Rosado
cases had to show that the defendants had knowledge of Pcolka's improper conduct. Noting affidavits filed by plaintiffs in the cases, the court held that it could not "find as a matter of law that the defendants did not owe a duty of care to the plaintiffs in the Sharon See and George Rosado cases. Whether the defendants owed a duty to the plaintiffs in the Sharon See and George Rosado cases must be decided in the factual context of a full trial." Id., 276.
The decision in See v. Bridgeport Roman Catholic DioceseCorp., supra, 20 Conn. L. Rptr. 271, was not a final judgment, as the defendants' motion for summary judgment was granted as to the plaintiffs' claims based on vicarious liability and civil conspiracy, but was denied on the present negligence counts. Therefore, the court may consider the previous treatment of the plaintiffs' negligence claims as law of the case.
 IV. CONCLUSION
The court finds that the free exercise clause and the establishment clause do not prevent a state from prohibiting criminal conduct on the part of clergy through laws not aimed at the promotion or restriction of religious beliefs. Nutt v.Norwich Roman Catholic Diocese, supra, 921 F. Sup. 74. To rule otherwise would result in declaring the state and its inhabitants unable to seek redress when clergy are accused of endangering the welfare and safety of minors regardless of state law in place to protect such minors from the very abuses alleged. This court believes that these plaintiffs' claims may be adjudicated by purely neutral secular principles or standards. Therefore, the court concludes that neither the establishment clause nor the free exercise clause of the first amendment preempt or prohibit this court from determining the negligent supervision claims against the defendants. CT Page 6962
In addition the court finds that there are material issues of fact concerning whether and/or when diocese officials knew or should have known about Pcolka's alleged improper behavior, an issue best left for resolution by the trier of fact.
Accordingly, the defendant's Renewed Motion for Summary Judgment dated November 6, 1997 is denied.
DAVID W. SKOLNICK, JUDGE