[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTION FOR SUMMARY JUDGMENT (#112)
The defendants Norwich Roman Catholic Diocesan Corporation (Diocesan Corporation) and Daniel A. Hart,[1] Bishop of the Norwich Diocese (Hart), move for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part as to Hart and denied as to the Diocesan Corporation.
 Facts
The plaintiff, John Doe,[2] filed the three count complaint in this action on June 7, 2000. The moving defendants seek summary judgment as to the second and third counts directed against them. The named defendant, Richard T. Buongirno, was a Catholic priest during the time the acts complained of occurred. The plaintiff alleges that he met Buongirno in 1987, when the plaintiff was an altar boy at St. Mary's parish in Portland, Connecticut. The plaintiff further alleges that from 1987 until 1998, Buongirno sexually assaulted him repeatedly. The first count of the complaint is against Buongirno for sexual assault. In the second count of the complaint, the plaintiff alleges that Hart and the Diocesan Corporation knew or should have known of the improper relationship between Buongirno and the plaintiff but nevertheless failed to investigate, investigated inadequately, or concealed the results of their investigation, thereby allowing Buongirno to continue molesting the plaintiff. The plaintiff alleges that Hart and the Diocesan Corporation were careless or negligent in a number of ways including, inter alia: (1) failing to adequately investigate; (2) knowingly allowing the assaults to continue; (3) failing to promulgate adequate rules and policies to protect children; (4) failing to warn parents; and (5) failing to provide the plaintiff with counseling or other care. In the third count, the plaintiff repeats the allegations regarding Buongirno's alleged assaults on the plaintiff, and claims that the acts of Hart and the Diocesan CT Page 9810-a Corporation were reckless, wanton and wilful.
Hart and the Diocesan Corporation filed a motion for summary judgment on August 31, 2000, supported by various documents and a memorandum of law. On April 24, 2001, the plaintiff filed a memorandum of law and supporting documentation in opposition to the motion for summary judgment. The parties subsequently filed a number of supplemental memoranda and documents. Argument on the motion took place on March 11, 2002 and April 2, 2002.
 Discussion
"Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book [§ 17-46]." (Internal quotation marks omitted.)H.O.R.S.E. of Connecticut, Inc. v. Washington, 258 Conn. 553, 559-60,783 A.2d 993 (2001).
Hart and the Diocesan Corporation claim that they are entitled to summary judgment because there are no genuine issues of material fact and they are entitled to judgment as a matter of law. Specifically, they argue: (1) that there is no evidence that they knew or had any reason to know that Buongirno posed any threat of sexual assault to any child, including the plaintiff; (2) that the first amendment to the United States constitution bars adjudication of any claims based on the internal administrative policies of the church or diocese; and (3) that there is no evidence that they acted in a reckless, wanton and wilful manner. The court will address each of these claims in turn.[3]
 Factual Recitation
The plaintiff asserts the following facts as set forth in his own affidavit which the court views in the light most favorable to the plaintiff (the non-movant) for the purposes of this motion. In 1987, at the age of seven, the plaintiff became an altar boy at Saint Mary's CT Page 9810-b parish in Portland. He first met Buongirno in 1988, when Buongirno came to the parish as a parish priest, in which capacity he was in charge of all parish matters, including supervision of altar boys. At the time, the plaintiff's father was very ill, and Buongirno visited the plaintiff's home several times. Buongirno became a close friend of the plaintiff and his family, even dining at their home. Once during this period, the plaintiff spent an afternoon with Buongirno in the rectory. A short time later, Buongirno was transferred to a parish in Ashford, Connecticut, but continued to visit with the plaintiff's family regularly. In 1990, after Buongirno was transferred to Saint Mathias Church in East Lyme, the plaintiff began to spend more time with him in the rectory. The plaintiff, who was nine and ten years old at the time, frequently spent weekends alone with Buongirno, who began to get "physical and intimate" with the plaintiff. Buongirno told the plaintiff to sleep in the same bed with him because it would be more convenient for the housekeeper. When they were in bed together, Buongirno would sexually assault the plaintiff.
In March 27, 1991, the plaintiff and his siblings were taken from class in their respective schools and questioned by an employee of the department of children and youth services (now the department of children and families) regarding the plaintiff's relationship with Buongirno. When the plaintiff's mother spoke to Buongirno about the investigation, he denied having an improper relationship with the plaintiff. After that time, the plaintiff's mother no longer allowed the plaintiff to see Buongirno, although they did continue to speak on the phone for a time.
On March 15, 1997, Buongirno and Hart were celebrants at the plaintiff's Junior Ring Mass. at Xavier High School in Middletown. After the mass, the plaintiff saw his mother speaking with Buongirno, and said hello. Subsequently, the plaintiff's mother resumed her close friendship with Buongirno. Buongirno began to give plaintiff gifts, including a new computer system, shares of Microsoft stock and a summer's use of a 1956 Chevrolet Belair. The plaintiff and Buongirno began to spend more time together and Buongirno helped the plaintiff through the steps of choosing and applying to colleges. At first, the plaintiff refused Buongirno's physical advances, but eventually the sexual relationship resumed. Plaintiff avers that Buongirno told him that the plaintiff was gay, that nobody else would want the plaintiff, and that their relationship was blessed by God. The plaintiff and Buongirno engaged in sexual conduct at the rectory, at Buongirno's parents' home and in the car. The two also took trips to New York once or twice a month. On at least two occasions, Buongirno forced the plaintiff to have sex with him. After the plaintiff graduated from high school, Buongirno took him on a cross country trip. CT Page 9810-c During the trip, Buongirno forced the plaintiff to have sex with him. When the plaintiff and Buongirno were in South Dakota, Diocesan officials became aware of the trip, and ordered Buongirno back to Connecticut immediately.
Hart became Bishop and chief executive of the Diocesan Corporation on November 1, 1995, and prior to that time was not affiliated with the Diocesan Corporation.
 A
Hart and the Diocesan Corporation argue that adjudication of certain allegations of negligence contained in the second count of the complaint are barred by the first amendment to the United States constitution. Specifically, they argue that this court is constitutionally prohibited from considering any claims that they failed to establish policies to prevent their employees from sexually assaulting children. According to Hart and the Diocesan Corporation, these allegations of negligence "would impermissibly require this court to interpret and to weigh the meaning and the application and the reasonableness of the internal clergy personnel policies and practices of a religious organization." The court disagrees.
While the first amendment does afford defendants certain protection, it is totally inappropriate to invoke that doctrine in the circumstances before the court.
Numerous courts have determined that a claim of institutional negligence does not require any inquiry into religious doctrine or practice. ". . . `Instead, review only requires the court to determine if the Church Defendants knew of [the minister's] inappropriate conduct, yet failed to protect third parties from him. The court is simply applying secular standards to secular conduct which is permissible underFirst Amendment standards.' Konkle v. Henson, 672 N.E.2d 450, 456 (Ind.App. 1996). `The common law doctrine of negligence does not intrude upon the free exercise of religion, as it does not "discriminate against [a] religious belief or regulate or prohibit conduct because it is undertaken for religious reasons.". . . The court's determination of an action against the defendants based upon their alleged negligent supervision of [their employee] would not prejudice or impose upon any of the religious tenets or practices of Catholicism. Rather, such a determination would involve an examination of the defendants' possible role in allowing one of [their] employees to engage in conduct which they, as employers, as well as society in general expressly prohibit.' (Citation omitted.) NuttCT Page 9810-dv. Norwich Roman Catholic Diocese, 921 F. Sup. 66, 74 (D. Conn. 1995). `Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution.' Moses v. Diocese of Colorado,863 P.2d 310, 320 (Colo. 1993), cert. denied, 511 U.S. 1137,114 S.Ct. 2153, 128 L.Ed.2d 880 (1994)." Rosado v. Bridgeport Roman CatholicDiocesan Corp., 45 Conn. Sup. 397, 400-401, 716 A.2d 967 (1998).
"It is apparent to the court, that in determining whether the defendants were negligent in the supervision of [their employee], it would be able to apply neutral principles of tort law to determine whether the defendants failed to act when they knew or should have known of [the employee's] engaging in the alleged tortious conduct. `[T]here is no indication that, by taking the kind of preventative action required by tort law, the [institutional] defendants would have violated any "doctrine practice or law" of the Roman Catholic Church. In the absence of such a conflict, subjecting the [institutional] defendants to potential tort liability does not violate their right to the free exercise of their religion.' Smith v. O'Connell, 986 F. Sup. 73, 79 (D.R.I. 1997)." Rosado v. Bridgeport Roman Catholic Diocesan Corp., supra,45 Conn. Sup. 401.
Furthermore, steps a religious corporation would take to protect children from predatory conduct of employees who would be violating the church's own rules by acting in a predatory manner would not prejudice or impose upon the religious beliefs or practices of the Catholic faith.
"[T]he court will be able to apply neutral principles of tort law to conduct that is expressly prohibited by the laws of this state. `We have never held that an individual's religious beliefs excuse him from compliance with an other valid law prohibiting conduct that the State is free to regulate.' Employment Division, Dept. of Human Resources ofOregon v. Smith, 494 U.S. 872, 878-79, 110 S.Ct. 1595, 108 L.Ed.2d 876, reh. denied, 496 U.S. 913, 110 S.Ct. 2605, 110 L.Ed.2d 285 (1990) . . . `Since the Supreme Court has consistently failed to allow the Free Exercise Clause to relieve [an] individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs, the defendants [cannot] appropriately [invoke] the First Amendment as a defense to their alleged negligent conduct.' (Internal quotation marks omitted.) Nutt v. Norwich Roman Catholic Diocese, supra, 921 F. Sup. 74. `The Free Exercise Clause might well prohibit this court from interfering in the manner in which the Diocese supervised a priest's performance of Mass, or confession, but it certainly cannot prohibit this court from determining whether the Diocese should be liable for negligently allowing its employees to engage in criminal conduct.' Reed v. Zizka, Superior CT Page 9810-e Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV950555221S (March 5, 1998, Aurigemma, J.). . ." Rosado v. BridgeportRoman Catholic Diocesan Corp., supra, 45 Conn. Sup. 402-403. In the present case, Hart and the Diocesan Corporation have not pointed to any particular church doctrine, practice or law that would be violated by the application of ordinary tort law principles to their conduct. There is no constitutional bar to the application of neutral principles of tort law to determine whether Hart and the Diocesan Corporation's failed to act if they knew or should have known of Buongirno's alleged tortious conduct. Consequently, the motion for summary judgment may not be granted onfirst amendment grounds.[4]
 B
The court next considers the claim made by Hart and the Diocesan Corporation that they are entitled to summary judgment because there is no evidence that they knew or had any reason to know that Buongirno posed any threat of sexual assault to any child, including the plaintiff and therefore there is no evidence on which to base a negligence claim. "Negligent conduct . . . is defined as conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. . . . In negligence, the actor does not desire to bring about the consequences which follow, nor does he know that they are substantially certain to occur, or believe that they will. There is merely the risk of such consequences, sufficiently great to lead a reasonable person in his position to anticipate them, and to guard against them." (Citations omitted; internal quotation marks omitted.)American National Fire Ins. Co. v. Schuss, 221 Conn. 768, 776-77,607 A.2d 418 (1992). "A conclusion of negligence or freedom from negligence is ordinarily one of fact. . . . The trier must determine whether, in his own opinion, the defendant's actions meet the standards of conduct for one of reasonable prudence." (Citation omitted.) Amendolav. Geremia, 21 Conn. App. 35, 37, 571 A.2d 131, cert. denied,215 Conn. 803, 574 A.2d 218 (1990). "[I]ssues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." (Internal quotation marks omitted.)Henriquez v. Magnavice, 59 Conn. App. 333, 336 n. 2, 757 A.2d 627
(2000).
The court will examine this claim separately as it relates to the Diocesan Corporation and as it relates to Hart in light of that standard. CT Page 9810-f
 1. The Diocesan Corporation
The evidence submitted by the parties could support a finding of the following facts. In 1985, two Catholic priests wrote a letter or white paper to the various bishops informing them of the seriousness of the issue of sexual misconduct in the church. Monsignor Thomas R. Bride, the Vicar General of the Diocese of Norwich, testified at his deposition that this paper served as a "wake-up call" regarding the issue. In 1988, Father Bernard Bush was brought to the Norwich Diocese to serve as director of the newly created Office for the Development of Ministry Personnel. In that position, Bush served as the liaison between the diocese and the state department of children and youth services (DCYS).[5] In early 1991, Bush received a phone call informing him that there had been a complaint to DCYS regarding allegedly inappropriate or suspicious conduct by Buongirno involving a boy staying at the rectory. Bush called Bishop Daniel Reilly, who in turn notified Bride. Reilly subsequently informed Bride that the complaint was a "false alarm."[6] The diocese did no further investigation of the matter, and the incident was not noted in Buongirno's personnel record. The plaintiff's mother also told Sister Mary Ida Dolan, Director of Religious Education at Saint Mary's Parish in Portland, that the plaintiff and his siblings had been interrogated regarding the relationship between Buongirno and the plaintiff. Dolan never spoke to anybody else in the Diocese about the conversation with the plaintiff's mother.
Other evidence submitted to the court, viewed in the light most favorable to the plaintiff indicates that in March, 1994, an individual named Edward Redmond contacted Monsignor Bride and informed him that many years earlier, when Redmond was between the ages of sixteen and eighteen or nineteen and before Buongirno became a priest, Buongirno had sexually abused him. After going into therapy to deal with the severe psychological problems brought on by the abuse, Redmond decided to confront Buongirno, and learned for the first time that Buongirno was an ordained priest. Redmond told Bride that he was concerned that Buongirno would hurt other young boys. Redmond subsequently met with Bride in person and signed an affidavit detailing Buongirno's abuse of him. Bride allegedly assured Redmond that the diocese would never allow Buongirno to be involved with children in the future. Buongirno subsequently met with Bishop Reilly and admitted to Redmond's allegations. Buongirno was immediately removed from his position as pastor and sent to the Institute of Living located in Hartford, for evaluation and treatment on an outpatient basis. The parties have submitted no evidence showing that the CT Page 9810-g Institute of Living was informed of any allegations of sexual impropriety other than the relationship with Redmond that occurred before Buongirno became a priest. (Specifically, apparently the Institute of Living was not informed by the Diocesan Corporation of the 1991 DCYS investigation.) In fact, the records from the Institute of Living indicate that Buongirno "had maintained his celibacy throughout his years in the priesthood." After several months of treatment, the Institute of Living discharged Buongirno on October 1, 1994. The discharge summary prepared by the Institute of Living indicates that "[t]he outcome of treatment is that the patient will continue in active ministry as an associate in a local parish."
In late 1994, Bride assigned Buongirno to work as a vicar at Saint John's parish in Cromwell under the supervision of Father Daniel McGrath. Bride told McGrath that Buongirno was finishing up treatment at the Institute of Living, but did not explain why. When McGrath asked Bride whether there was anything he should know about Buongirno's treatment, Bride answered "no." McGrath was not aware that there had been accusations of sexual misconduct on the K part of Buongirno. At some point during Buongirno's assignment at Saint John's, McGrath became aware that Buongirno was visiting with a boy or young man in his private room in the rectory. McGrath informed Buongirno that is was not an acceptable practice to have guests in the private quarters of the rectory. McGrath did not bring the incident to the attention of Bride or anybody else.
Eventually, Buongirno was transferred to Saint Francis Parish in Middletown. The pastor of Saint Francis, Monsignor M. Davitt Fox, was not told about the allegations of sexual misconduct in Buongirno's past. Fox knew that Buongirno often had boys or young men in his private quarters in the rectory during the day. One night at around 10 p.m., Fox became aware that Buongirno had a boy in his room. Fox called Buongirno over an intercom and told Buongirno to get the boy out immediately. All of the foregoing events occurred prior to the incident in June, 1998, when Buongirno continued to have sexual contact with the plaintiff and was ordered back to Connecticut from South Dakota.
The Diocesan Corporation argues that it was not negligent because it was reasonable for it to rely on the conclusion of DCYS that the allegation against Buongirno in 1991 was unsubstantiated. The Diocesan Corporation also argues that it reasonably relied on the 1994 opinion of the Institute of Living in 1994 that Buongirno did not present a threat of sexual abuse. CT Page 9810-h
In the present case, the plaintiff has submitted evidence that could support a finding that the Diocesan Corporation or its agents knew: that Buongirno was investigated in 1991 for allegations that he had sexually assaulted the plaintiff; that Buongirno had admittedly been involved in a sexual relationship with a teenage boy in the past; and that on more than one occasion, Buongirno had boys in his private quarters in the rectories of the various parishes to which he was assigned. The incidents involving Buongirno could be found by a jury to be sufficient to raise a suspicion that Buongirno was a pedophile or ephebophile who posed a threat to children in the Diocese. Whether the Diocesan Corporation failed to take sufficient steps to prevent further harm to the plaintiff is a question of fact. The court therefore may not usurp the role of the factfinder by deciding this issue of negligence by way of summary judgment.
 2. Bishop Daniel A. Hart
With regard to Hart's alleged negligence, the following additional facts are relevant. Hart became Bishop of the Norwich Diocese on November 1, 1995.[7] As Bishop of the Norwich Diocese, Hart is also president of the Diocesan Corporation. Prior to coming to Norwich, Hart was an Auxiliary Bishop in the Archdiocese of Boston, and was not familiar with Buongirno. When he joined the Norwich Diocese, Hart reviewed the personnel files of the priests with Bride, who had been acting as administrator for the Diocese during the interim between Bishops. Hart was informed that Buongirno had been involved in some sexual impropriety before becoming a priest and that Buongirno had been treated at the Institute of Living in 1994. The plaintiff has not offered any evidence showing that Hart had knowledge, or any reason to know, of any allegations of sexual impropriety by Buongirno other than the relationship with Redmond.
As an initial matter, the court notes that Hart's role as Bishop does not make him personally liable for the torts of the Diocese. "[A]n officer of a corporation does not incur personal liability for its torts merely because of his official position . . . but if an officer [of a corporation] commits or participates in the commission of a tort, whether or not he acts on behalf of his . . . corporation, he is liable to third persons injured thereby." (Citation omitted; internal quotation marks omitted.) BEC Corp. v. Dept. of Environmental Protection, 256 Conn. 602,619, 775 A.2d 928 (2001). In the present case, therefore, Hart's liability, if any, must be based on his own tortious conduct, not the torts of the Diocesan Corporation or its agents. CT Page 9810-i
The evidence contained in the record, construed in the light most favorable to the plaintiff, could support a finding that Hart knew that Buongirno had a sexual relationship with a sixteen-eighteen year old boy prior to becoming a priest and that Hart also knew that the Institute of Living subsequently found that Buongirno was nevertheless fit to continue in the ministry. In contrast to the Diocesan Corporation, there is no evidence showing that Hart knew of any other allegations against Buongirno that would suggest any history whatsoever of sexual misconduct while in the priesthood, or any continuing propensity for such misconduct. There is also no evidence suggesting that Hart knew that the Institute of Living report was based upon incomplete information and he therefore could not rely upon it. By the time Hart came to the Norwich Diocese, Buongirno had already been discharged by the Institute of Living and was assigned to St. Francis parish in Middletown. Based on the evidence before the court, the only facts from which a finder of fact reasonably could conclude that Hart did not act as a reasonably prudent person would be his reliance upon the Institute of Living findings without taking additional steps either to investigate Buongirno further or put the pastor of St. Francis or others on notice of Buongirno's history to ensure more direct supervision to ensure no children would be at risk. "Even where a trial court finds that the evidence strongly favors one party, that court may not arrogate to itself the role of trier of fact and, thus, decide issues of material fact as a matter of law. A party has the same right to submit a weak case [to the jury] as he has to submit a strong one." (Internal quotation marks omitted.) Maffucci v. Royal ParkLtd. Partnership, 42 Conn. App. 563, 572, 680 A.2d 333 (1996), rev'd on other grounds, 243 Conn. 552, 707 A.2d 15 (1998). Thus, this is an issue to be submitted to a jury namely whether Hart acted prudently based upon what he knew regarding Buongirno and all of the surrounding circumstances. Hart therefore is not entitled to summary judgment on the second count.
 C
Finally, Hart and the Diocesan Corporation claim that they are entitled to summary judgment on the third count of the complaint, alleging reckless, wanton and wilful conduct.
"In order to establish that the defendants' conduct was wanton, reckless, wilful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts. . . . [Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to CT Page 9810-j infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) Elliott v.Waterbury, 245 Conn. 385, 415, 715 A.2d 27 (1998).
"While summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated [. . .] [t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." (Internal quotation marks omitted.)Jaser v. Fischer, 65 Conn. App. 349, 357, 783 A.2d 28 (2001). Thus, our Supreme Court has affirmed the granting of summary judgment when the evidence presented could not, as a matter of law, support a conclusion of reckless, wilful and wanton conduct.
A review of the evidence shows there is no basis for finding that Hart consciously acted in a reckless, wanton and wilful manner. Hart is therefore entitled to summary judgment on the third count. The court must next determine whether the Diocesan Corporation is entitled to summary judgment on the third count. A further review of Connecticut cases is helpful in this analysis.
For example, in Elliott v. Waterbury, supra, 245 Conn. 385, the plaintiff's decedent was jogging when he was accidentally shot and killed by a hunter on an adjacent watershed area. The defendant city permitted hunting in the watershed area. The trial court granted summary judgment on the counts alleging wanton, reckless, wilful, intentional and malicious misconduct by the city in failing to protect the plaintiff from the danger posed by the use of the watershed property for hunting. The Supreme Court affirmed. Evidence had been submitted to the trial court showing that the city had received complaints regarding hunters illegally discharging firearms on portions of the 1800-acre watershed tract. No such complaints had been received concerning the area where the plaintiff's decedent had been jogging. Id., 415-16. In addition, the watershed supervisor had expressed concerns to the mayor and an alderman regarding the safety of his employees. Id., 416. The court viewed this evidence "in light of the statutory and financial support of this state for maintaining hunting as a recreational activity and wildlife management technique and for encouraging landowners to open their lands CT Page 9810-k to the activity . . . and in light of the existence of a state regulatory regime that is designed to regulate, inter alia, hunting safety" and concluded that "the plaintiff's evidence was insufficient to establish wanton, reckless, wilful, intentional and malicious conduct." Id., 416-17.
In another case, Dubay v. Irish, 207 Conn. 518, 542 A.2d 711 (1988), the plaintiff conservator brought suit on behalf of the defendant's daughter, alleging that the defendant had acted in a wilful, wanton and reckless fashion in waiting four hours to take her daughter, who had taken an overdose of various prescription medications, to the hospital. The trial court granted the defendant's motion for summary judgment. In affirming the trial court, the Supreme Court noted the following undisputed facts: "[T]he defendant took prompt action upon discovering that Elizabeth had swallowed the pills. When the defendant first heard Elizabeth vomiting, she went to her aid and attempted to discern what was wrong. Elizabeth, however, did not immediately reveal what she had done. . . . Upon ascertaining that Elizabeth had ingested the medications, however, the defendant sought help from her other daughter and advice from her doctor and made preparations to take Elizabeth to the hospital. Elizabeth resisted, however, and refused to go. The defendant, therefore, as first aid, placed Elizabeth in a shower and forced her to drink coffee in an attempt to induce vomiting. Subsequently, Elizabeth requested that the defendant wait to see if she felt better before taking her to the hospital. Despite Elizabeth's requests to the contrary, however, the defendant finally insisted that Elizabeth obtain professional medical help and took her to Mount Sinai Hospital. Elizabeth was conscious, coherent, and apparently resistant the entire time." Id., 533-34. The court concluded that "a fair and reasonable trier could not possibly determine that the defendant's conduct was wilful, wanton and/or reckless." Id., 534.
The present case is readily distinguishable from those Supreme Court cases. Elliott involved an activity recognized and even encouraged under the laws of this state, i.e., hunting. The court concluded that, as a matter of law, the failure of the city to prevent the plaintiff from being injured by the effects of that activity could not be considered highly unreasonable conduct. In the present case, the plaintiff has alleged that the Diocesan Corporation failed to protect him from the activity condemned by society and the defendant Diocesan Corporation. Unlike the Elliott court, therefore, this court cannot hold as a matter of law that the alleged failure of Diocesan Corporation to act to protect the plaintiff from sexual abuse in light of the facts known to it and the surrounding circumstances was not highly unreasonable but rather the issue is properly submitted to a jury for determination. CT Page 9810-l
In Dubay, the trial court was presented with undisputed facts showing that although the defendant had delayed taking her daughter to the hospital, she had made a number of other efforts to care of her. The court held that no reasonable person could find that the mother had shown the kind of extreme departure from ordinary care that would support a finding of wilful, wanton or reckless conduct. In the present case, by contrast, there are not undisputed facts from which the court could conclude, as a matter of law, that the Diocesan Corporation did not act with reckless disregard of the just rights or safety of the plaintiff. The determination as to whether the Diocesan Corporation's conduct in face of the facts known to it constitutes reckless, wanton and wilful acts is, therefore, a question of fact to be determined by a jury and not disposed of by the court by way of summary judgment.
 Conclusion
For the reasons stated above, the motion for summary judgment is granted as to the third count and denied as to the second count as to the defendant Daniel A. Hart and denied as to the defendant Norwich Roman Catholic Diocesan Corporation.
McLachlan, J.